# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

EARNEST D. BEAMON, JR.,

                    Plaintiff,

v.

MICHAEL A. DITTMANN,
CAPTAIN WILKE,
CAPTAIN REYES,
LT. WESNER,
UNKNOWN Sued as Deputy Warden,
CAPTAIN TETZLAFF,
MICHELLE SMITH, and
C.O. HEFT,

                    Defendants.

Case No. 14-CV-136-JPS

ORDER

In this action, filed under 42 U.S.C. § 1983, Plaintiff Earnest D. Beamon ("Beamon"), a state prisoner, claims the defendants violated his First and Fourteenth Amendment rights. On August 2, 2016, this case was reassigned to this branch of the Court due to the unavailability of Judge Rudolph T. Randa. (*See* Docket #72). Judge Randa previously denied Beamon's motion for summary judgment. (*See* Docket #35, #60).

Presently before the Court is the defendants' October 26, 2015 motion for summary judgment (Docket #44) and Beamon's April 4, 2016 motion for reconsideration (Docket #69). These matters are fully briefed (Docket #45, #58, #63, #69, #70), and ready for disposition. For the reasons detailed herein, the Court will grant the defendants' motion for summary judgment, deny Beamon's motion for reconsideration, and this action will be dismissed in its entirety.

# 1. FACTUAL BACKGROUND[1]

In short, Beamon alleges that the defendants burdened his religious practices in violation of the Free Exercise Clause and retaliated against him because of his Muslim faith. Beamon further alleges that he did not receive due process in his disciplinary hearings for conduct violations. Although the parties dispute several of the specific facts, the Court finds that none are material to preclude summary judgment. When disputed, the Court views all facts in the light most favorable to Beamon as the non-moving party.

## 1.1 The Parties

Beamon is currently housed at Waupun Correctional Institution. At all times material to this action, he was housed at Redgranite Correctional Institution ("RGCI"). (DPFF ¶ 1).[2]

---

[1] The facts are taken from the defendants' proposed finding of fact ("DPFF") or Beamon's proposed finding of fact ("PPFF") unless otherwise noted. (Docket #26, #47).

[2] Beamon has failed to provide a response to the defendants' proposed findings of fact in violation of Civil Local Rule 56(b)(2)(B). (*See* Docket #57). Civil Local Rule 56(b)(4) provides that the Court "will deem uncontroverted statements of material fact admitted solely for purpose of deciding summary judgment."

Beamon verified his complaint and affidavits, however, and the Court may consider them to the extent that his allegations are based on personal knowledge. Fed. R. Civ. P. 56(e); *Ford v. Wilson*, 90 F.3d 245, 246-47 (7th Cir. 1996). In construing pro se filings liberally, the Court has made its best efforts to identify genuinely disputed facts based on Beamon's sworn statements. Beamon has submitted a voluminous amount of evidence, however, and it is not the Court's role to make Beamon's case for him and scour every inch of the record. *See United Sates v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("[j]udges are not like pigs, hunting for truffles buried in [the record]."; *see also Corely v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004) ("[W]e will not root through the hundreds of documents and thousands of pages that make up the record here to make his case for him.").

Case 2:14-cv-00136-JPS   Filed 09/14/16   Page 2 of 40   Document 75

Defendant Michael Dittmann ("Dittmann") is currently employed by the Wisconsin Department of Corrections ("DOC") as the Warden of Columbia Correctional Institution ("CCI"). Dittmann has been the warden at CCI since March 22, 2014. Prior to that, Dittmann was the warden at RGCI. (DPFF ¶ 2). Defendant Scott Eckstein ("Eckstein") is currently employed by the DOC as the Deputy Warden of the RGCI. (DPFF ¶ 3). Defendant Corey Heft ("Heft") is employed by the DOC as a Correctional Officer at the RGCI. (DPFF ¶ 4).Defendant Michael Reigh ("Reigh")[3] was previously employed by the DOC as a Supervising Officer 2 (Captain) at RGCI. (DPFF ¶ 5). Defendant Michelle Smith (Smith) is employed by the DOC as an Institution Complaint Examiner ("ICE") at the RGCI. (DPFF ¶ 6). Defendant Andrew Wesner ("Wesner") is currently employed by the DOC as a Supervising Officer 2 (Captain) at RGCI. Wesner was previously employed by the DOC as a Supervising Officer 1 (Lieutenant) at the RGCI. (DPFF ¶ 7). Defendant Edwin Tetzlaff (Tetzlaff) is employed by the DOC as a Supervising Officer 2 (Captain) at RGCI. (DPFF ¶ 8).

Defendant Jason Wilke ("Wilke") is employed by the DOC as a Supervising Officer 2 (Captain) at RGCI. Wilke is also a Certified Security Threat Group ("STG") Coordinator for the State of Wisconsin. (DPFF ¶ 9). Wilke has been the STG Coordinator at RGCI since April 18, 2012. Wilke's responsibilities as the STG Coordinator include: tracking Security Threat Groups and their members in the institution and documenting their

---

[3]Although not entirely clear, it appears to the Court that Defendant Scott Eckstein was initially listed on the docket as "Unknown *sued as Deputy Warden*" and that Defendant Michael Reigh was listed as "Captain Reyes." (*See* Docket #16 at 2) (Defendants' answer detailing parties in this action). In the end, this distinction matters little because, as described in detail below, the Court finds that Beamon's claims fail on the merits

activities, reviewing incoming and outgoing mail and property for STG-related content, preparing reports regarding Security Threat Groups for security staff and STG Coordinators at other DOC institutions, instructing RGCI staff regarding gang identification and gang management strategies, meeting on a regular basis to exchange information with the RGCI STG intelligence unit and STG Coordinators from other DOC institutions, and assessing ongoing STG activity with the institution and documenting their activities, reviewing incoming and outgoing mail and property for STG-related content, preparing reports regarding Security Threat Groups for security staff and STG Coordinators at other DOC institutions, instructing RGCI staff regarding gang identification and gang management strategies, meeting on a regular basis to exchange information with the RGCI STG intelligence unit and STG Coordinators from other DOC institutions, and assessing ongoing STG activity with the institution. (DPFF ¶ 10).

### 1.2 Religious Policies at RGCI

The religious practices afforded to inmates in DOC custody are set forth in the policies and procedures developed by the DOC Division of Adult Institutions ("DAI"). "Religious Beliefs and Practices," effective April 30, 2015, was implemented to ensure that incarcerated offenders have uniform opportunities to pursue lawful religious practices of the religion of their choice. (DPFF ¶ 12). DAI policies administer religious programming through the Umbrella Religion Group ("URG") structure, identifying eight categories to accommodate religious groups with similar beliefs and practices. The eight identified URGs include: Catholic, Eastern Religions, Humanist/Atheist/Agnostic, Islam, Judaism, Native American/American Indian, Pagan, and Protestant/Other Christian. DAI policies do not cite specific denominations or sub-groups, as it would be impossible to maintain

Case 2:14-cv-00136-JPS   Filed 09/14/16   Page 4 of 40   Document 75

an all-inclusive list within the ever-changing American society and religious views. DAI does not expect that every inmate identifying with a URG will hold identical beliefs and practices. (DPFF ¶ 13).

Inmates have a right to declare any religious preference while incarcerated in a DAI facility. They do so via intake interview or by filing a DOC-1090, "Religious Preference" form. They are encouraged to identify a URG, "Other" or "No Preference" which will most closely match their beliefs and practices. URG designation dictates which services or studies they may attend and which religious property and diets they may be eligible to receive. Inmates may engage in individual practice or study in their cell related to any faith, regardless of URG designation. They may also change their religious preference designation every six months, if desired. (DPFF ¶ 14). Inmates may generally exercise their religious beliefs and practices in any of the following ways: (1) congregate URG services and study groups; (2) request for religious diet accommodation; (3) individual study; (4) personal meditation, prayer, and/or other spiritual practices; (5) utilization of religious books and/or property; (6) observance of religious holidays in a URG service, study, or congregate meal; (7) individual religious observances/rituals in their living quarters; (8) correspondence with fellow believers; (9) pastoral visits; and (10) requesting to abstain from work or program on religious days of observance. (DPFF ¶ 16).

Individual inmates may submit a DOC-2075, "Request for New Religious Practice" form, when seeking a new religious accommodation, such as an activity or practice that is not already offered at the institution, a religious property item that is not included on the DAI Religious Property Chart, or a dietary accommodation not offered under DAI Policy #309.61.03. (DPFF ¶ 17).

During the relevant time period, Beamon identified his religious preference as the Islamic URG. (DPFF ¶ 15).[4] Pursuant to DAI Policy #301.61.02, dated February 22, 2015, and the Religious Property Chart dated July 21, 2015, male DOC inmates who designated a religion that fell under the Islam umbrella group could possess the following religious property for their personal use, consistent with the restrictions set forth in DAI #309.61.02: (1) One Specified Emblem; (2) A religious calendar; (3) Religious Books and Publications; (4) Religious Art; (5) Kufi-Cap (black only); (6) Miswak (Toothstick); (7) Oil for Religious Purposes; (8) Prayer Beads (Thikr Beads); (9) Prayer Robe, Thawb, Kurda, or Jalabiya; (10) Prayer Rug; and (11) Turban or Kufiyya (white only). Religious publications and books are not restricted to an inmate's identified religious preference. (DPFF ¶ 19).

### 1.3    Security Threat Groups

The DOC identifies an STG as a group of individuals which threatens, intimidates, coerces or harasses others, or engages in activities which violates or encourages the violation of statutes, administrative rules, departmental policies or institution procedures. Examples of STGs include street gangs and hate groups. (DPFF ¶ 22). STGs are prohibited within the DOC because they threaten the safety of staff and other inmates which would include but not be limited to: assaults, riots, battery and intimidation, as well as introduction

---

[4]During Beamon's prior incarceration from May 23, 2007, to July 11, 2007, he identified religious preference for the Protestant URG. Upon readmission on February 16, 2010, he continued Protestant URG religious preference. Shortly after transferring to RGCI on March 31, 2010, he changed to the Islamic URG on April 27, 2010. After a subsequent transfer to the Waupun Correctional Institution on October 2, 2013, Beamon reaffirmed Islamic religious preference with a DOC-1090 form on October 8, 2013. Beamon later changed religious preference to the Jewish URG on November 17, 2014, with an electronic DOC-1090 in WICS. Most recently, he changed his religious preference back to the Islamic URG via DOC-1090 on April 9, 2015. (DPFF ¶ 15).

of contraband into the institution. (DPFF ¶ 24). STGs also undermine prison authority by providing a support system for those taking an oppositional stance to the prison administration. (DPFF ¶ 25).

Suppressing STGs activity in DOC institutions is imperative to maintaining a safe and secure environment for staff, inmates, and visitors. (DPFF ¶ 27). DOC suppresses STG activity by educating staff, interviewing STG members, searching inmates' property and living areas for contraband, monitoring telephone conversations and monitoring incoming and outgoing mail for STG related materials. (DPFF ¶ 28). STG information is shared within and between institutions, centers, DCC and law enforcement agencies. Networking and cooperation within the DOC and information sharing with outside law enforcement, and the Departments of Corrections in other jurisdictions, are essential elements for effective management of an STG. (DPFF ¶ 29).

Most, if not all, Supremacist STGs utilize religion in some form or fashion to hide their activity from security detection and further their agendas. Religion is a very powerful control measure and is easily used to manipulate and control subservient members along with circumventing security measures. Inmates know religious rights are protected. So religion is widely used to hide STG activity and express affiliation. Most STGs will follow religions that are loosely based historically on what is believed to be racial alliances such as White Supremacist STGs using Paganism, Asatru or Odinism. The Latin Kings are a well-known nationwide STG and are well-documented as practicing the Native American faith while incarcerated. Some may follow the religious doctrine, but many use the religious services as a means to hold gang meetings and pass contraband. STGs that are

predominantly African American are well-known to follow the Islamic faith. (DPFF ¶ 30).

### 1.4 Nations of Gods and Earths and Security Threat Designation

The Nation of Gods and Earths ("NGE"), is a designated STG in the Wisconsin DOC. (DPFF ¶ 37). NGE, or the Five Percent Nation ("Five Percenters"), originated in New York City in the 1960s after its leader, Clarence Smith (also known as Clarence 13X and Father Allah), broke away from the Nation of Islam ("NOI"). (DPFF ¶ 31). The name Five Percent Nation stems from the group's belief in "Supreme Mathematics," which breaks down the population of the world into three groups: the Ten Percent, the Eighty Five Percent, and the Five Percent. The Ten Percent are those who have subjugated most of the world. They include Caucasian people and others who create and spread the myth of a nonexistent mystery God. They are described as rich, blood suckers, and slave makers of the poor. The Eighty Five Percent are those who are subjugated and deceived. They are easily led in the wrong direction, and are hard to lead in the right direction. Finally, the Five Percent are African Americans who have achieved self-knowledge. They know the African American man's true nature and that God is within the Black Man himself. NGE followers believe that the Black Man is a living, breathing God. Male members of the group are referred to as "Gods," female members are referred to as "Earths." As a result, the group often also refers to itself as "The Nation of Gods and Earths." (DPFF ¶ 32).

The teachings of NGE are located in part in the "120 Lessons." The 120 lessons are a revised version of the Supreme Wisdom Lessons of the Nation of Islam, originally written by Wallace Fard Muhammad and Elijah Muhammad, and a large portion of the ideology between NGE and NOI is similar. (DPFF ¶ 33). The NGE ideology states that the "White Man" was

created by an evil scientist named "Yucab," 6,000 years ago using a process called "Grafting." The NGE preaches that Caucasians were created using genetics of the Devil, therefore all White People are inherently evil. The NGE teach and believe that the "White Man" is the "Devil" and is not to be trusted. (DPFF ¶ 34). NGE teaches as ideology that the Original Man is the Asiatic Black Man, who is "the maker the owner the cream of the Planet Earth. Father of civilization and God of the Universe." The ideology teaches that the African American Males have the power to "Build and Destroy." "Build is to add on or to elevate positivity. Destroy is to take away negativity." It teaches to "build a righteous nation and destroy the devil's civilization." The "Devil's Civilization" is the Caucasian civilization.(DPFF ¶ 35).

NGE uses a specialized coded language known as the Supreme Mathematics and Supreme Alphabet. Supreme Mathematics is a system of understanding numerals as representations of concepts. For example: 1 is Knowledge, 2 is Wisdom, and 3 is Understanding. The Supreme Alphabet is a system of assigning meaning to letters in the alphabet. For example A stands for Allah, and the M stands for Master. Interpreting NGE's coded language can be quite difficult and requires expertise and time not usually possessed by most correctional staff. Most correctional staff are not trained in the specifics of all STGs. The literature used by the NGE can be easily overlooked by staff that do not specialize in STG activity or investigation. (DPFF ¶ 36).

The most significant factor in the DOC's decision to designate NGE an STG was the multiple incidents of STG activity and violence caused by NGE members in prisons in other jurisdictions. (DPFF ¶ 38). The South Carolina Department of Corrections identified the NGE as an STG around 1996. In

1995, A group of NGE inmates attacked three correctional officers, beating the officers with their own batons and assaulting them with their own pepper spray. An incident report for the attack stated that the inmates acted as a group, they felt that they were acting in a manner acceptable to their religious beliefs, and that they spoke of more violence to come. Later that year, a group of NGE inmates were responsible for a prison riot in which several staff members were assaulted with baseball bats, stabbed, and had scalding water poured on them. Two females were held hostage in the cafeteria for almost twelve hours before finally giving up. The South Carolina Department of Corrections identified the NGE as a moving force to unite the street gangs together. *See In re Long Term Administrative Segregation of Inmates*, 174 F.3d 464, 466 (4th Cir. 1999). Several years ago, the South Carolina Department of Corrections worked an operation that apprehended twenty-two individuals attempting to introduce contraband into a facility. Eighteen of the twenty-two were former inmates and all were believed to be NGE. (DPFF ¶ 39).

In 1998, New Jersey designated NGE as a prohibited STG. NGE groups became active in New Jersey prisons in the 1980s and at various points were the largest STG group in the New Jersey prison system. In 1993, 30 NGE inmates in New Jersey participated in a group demonstration in the gymnasium during recreation. A subsequent investigation revealed that the group was planning on assaulting prison staff and to take at least one officer hostage. In 1996, 50-60 inmates belonging to NGE and a rival gang conducted an unauthorized meeting during recreation. That same year, between 25 and 30 inmates were involved in a fight between NGE inmates and a rival gang. In 1997, an NGE inmate stabbed an officer with a homemade knife causing serious injuries. After the attack, four other NGE inmates barricaded

themselves in the gymnasium, set fires, and damaged prison property. The state also experienced numerous instances of violent attacks by NGE inmates prior to labeling the group an STG. *See Fraise v. Terhune*, 283 F.3d 506, 512-13 (3rd Cir. 2002); (DPFF ¶ 40). Information provided to Wisconsin by other states indicates that NGE groups in prison in North Carolina, South Carolina, and Virginia have engaged in various activities that have created institutional disturbances including assaults, extortion, and drug trafficking.

The Black Supremacist teachings and ideology of the NGE did contribute in part to the DOC's decision to identify the group as an STG. Materials and speech which promote racial hatred and supremacy, including purported religious materials, are prohibited due to the risk they create of violence and disruption in prison. The inmates in Wisconsin prisons are racially diverse. Allowing inmates to openly align themselves with racial supremacist groups would dramatically increase the chances of conflict and violence between inmates of different races. (DPFF ¶ 42). Additionally, NGE's message that Caucasian people are devils who attempt to subjugate African Americans makes it more likely that NGE members would commit acts of violence towards staff or work to undermine their authority. (DPFF ¶ 42).

In order to maintain security and discipline within the institution, it is necessary for prison staff to maintain authority and control over the inmate population. The majority of staff at RGCI are Caucasian. NGE inmates are likely to believe and advocate that the authority held by Caucasian staff members over them is illegitimate as part of the "The Devil's" subjugation of African Americans. Allowing inmates to spread this racist and inflammatory message would increase the chance of disruption in the

Case 2:14-cv-00136-JPS   Filed 09/14/16   Page 11 of 40   Document 75

institution and acts of violence against staff and or other inmates. (DPFF ¶ 43).

NGE's use of code language, in the form of the Supreme Mathematics and the Supreme Alphabet, also contributed to the DOC's decision to identify the group as an STG. Many inmates have used Supreme Mathematics and Supreme Alphabet to create complicated coded messages that are hard for trained staff to decipher. Inmates' use of codes, symbols or language that cannot be interpreted by security staff is a security risk because secret means of communication amongst inmates allows inmates to organize and plan conspiracies, assaults, and escapes. Conspiracies amongst inmates can include groups of inmates who collectively decide to conduct disruptive activities, such as a group refusal to work, conspiracies to assault staff or other inmates, and conspiracies to conduct fraudulent activities. (DPFF ¶ 45).

The DOC has designated a number of purported religious groups as STGs in part due to their racial supremacist teachings. For example, the DOC has designated World of Church of the Creator (Creativity Movement) and Wootinism as STGs in part because of their white supremacy ideology. The DOC has designated Black Hebrew Israelites and Milanics as STGs in part because of their black supremacy ideology. Currently, the DOC does not consider Nation of Islam ("NOI") an STG, but does carefully review all NOI material for prohibited racial supremacy and anti-Semitic content. NOI publications are closely monitored for either racial supremacy literature or calls to violence by this group or groups that are very similar in nature and ideology. Although many NOI publications are allowed, many are prohibited within the DOC. The DOC has designated Fruits of Islam, an NOI militant branch, as an STG due to its military style structure. (DPFF ¶ 44).

Numerous other state correctional agencies consider NGE an STG, and as a result prohibit NGE activity in prison. As of 2010, Minnesota, South Carolina, North Carolina, Georgia, Florida, Kentucky, Tennessee, New Hampshire, Virginia, and New Jersey listed NGE as an STG. To the best of Wilke's knowledge these state correctional agencies still classify the NGE as an STG. (DPFF ¶ 46).

Because NGE is a designated STG, inmates within the DOC are prohibited from possessing NGE literature and symbolism, showing affiliation or allegiance to NGE, or engaging in NGE related activities. Inmates who violate this prohibition are subject to discipline under Wis. Admin. Code § DOC 303.20.1. (DPFF ¶ 47).[5] Specifically, inmates are not allowed to possess documents related to the 120 Lessons, Supreme Mathematics, or the Supreme Alphabet, as these teachings and ideology promote racial supremacy. They also are not allowed to posses NOI's Supreme Wisdom Lessons. (DPFF ¶ 47).

NGE has been a prohibited STG during the entire time Wilke has worked for the DOC. Wilke played no role in the decision to designate NGE as an STG. The STG Coordinator at Dodge Correctional Institution is responsible for determining whether a group constitutes an STG. As the STG Coordinator at RGCI, it is Wilke's duty to enforce the DOC's ban on all STG activity, including activity related to NGE. (DPFF ¶ 48).

---

[5]In December 2014, Wis. Admin. Code ch. DOC 303 was revised. Though most provisions remain substantively the same, many have been renumbered. For purposes of this order, any reference to the Wis. Admin. Code ch. DOC 303 will be to the Register, December 2006 version unless otherwise noted.

### 1.5    RGCI Mail Policies

With the exception of legal and other specified mail, staff inspect all incoming and outgoing mail by opening and visually inspecting it. Incoming mail is read if there is a justifiable belief that contents constitute a risk to the safety and security of the facility, specific individuals or the general public, or when there is reason to believe that the inmate or the sender is involved in criminal activity. Mail may be randomly read in addition to being inspected. Incoming packages are opened, inspected, and processed. Mail may not be delivered if it violates DOC regulations. (DPFF ¶ 49). If approved by the Security Director, inmates may be placed on a mail monitoring status. Under this status, all of the inmate's incoming and outgoing mail will be closely read by a designated security supervisor instead of regular mail room staff. (DPFF ¶ 51).

The same prohibitions that apply to inmate mail also apply to publications. Additionally, inmates may not receive publications that: (1) teach or advocate violence or hatred and present a danger to institutional security and order; or (2) teach and advocate behavior that violates the law of the state or the United States or the rules of the department. (DPFF ¶ 52). The DOC cannot prohibit a publication solely because of its appeal to a particular ethnic, racial, or religious audience, or because of the political beliefs expressed therein. The fine line between these two rules can be very challenging for mail room and security staff to implement when reviewing publications. As a general rule, publications are prohibited if they contain calls for violence, uprising against authority, or express hatred towards, or inferiority of, other racial, ethnic, or religious groups. (DPFF ¶ 53). The DAI Security Chief reviews all publications that are denied for prohibited content, and makes the final call on whether the denial was correct. If a publication

Case 2:14-cv-00136-JPS   Filed 09/14/16   Page 14 of 40   Document 75

received at an institution is deemed to have prohibited content, or is questionable for prohibited content, it is forwarded to the DAI Security Chief for a final determination of whether it is allowed. If the Security Chief deems that the publication is prohibited, it is added to a list of denied publications maintained by the DOC. (DPFF ¶ 55).

### 1.6 Beamon's Conduct Report #2329927

About two months prior to June 16, 2013, correctional staff found information regarding Supreme Mathematics in Beamon's cell during a search. Wilke had a meeting with Beamon and educated him that NGE is considered an STG by the DOC and that he is not allowed to possess NGE material, show NGE affiliation, or engage in any NGE activities. Wilke did not issue him a conduct report for possessing contraband STG materials because it was the first time he was found with NGE material, it was a small amount, and his behavior was not overt. Wilke informed him that he could receive a conduct report for any further NGE related activity. (DPFF ¶ 61).

About three weeks later, Wilke had a second meeting with Beamon for continued NGE activity. Wilke does not recall the specifics of the NGE materials Beamon was in possession of, but Wilke did reiterate that NGE materials are considered STG materials by the Wisconsin DOC. Wilke did not issue Beamon a conduct report for this incident. At that time, Wilke felt that the best way to deter Beamon from continuing to violate the rules by engaging in NGE activity was education. Wilke conveyed that he could be disciplined for further violations. (DPFF ¶ 62).

On June 16, 2013, Lieutenant Toney from the Oshkosh Correctional Institution contacted Wilke and informed him that he had intercepted a letter written by Beamon to another inmate. Beamon's letter contained numerous references to and literature utilized by the 5% NGE or the Nation of Gods

and Earths. (DPFF ¶ 63). In the letter, Beamon began with "Peace God," and refers to Inmate Morse as a "God" numerous times throughout the letter. He also referred to the mother of his children and his daughter as "Earths." (DPFF ¶ 64). On page one of the letter Beamon admits that he was going by the name "Supreme Understanding," but states that "with growth" he took the name "Born Prophet," and signs off the letter as "Born Prophet Allah." (DPFF ¶ 65). In the letter he indicated that he is trying to start a website called "G.O.D.S. TEMPLE," which he described as being "about reaching out to Black famil[ies] and our youth." (DPFF ¶ 68). Beamon further stated in the letter that:

> I have plenty of the Gods books. I stay in the 120 lessons daily to keep my mind free and open in order to save others I had to save SELF. I build with a few of the Gods here they go by the names Cee-Allah and Divine Allah they some alright brothers B.U.T. you know like all brothers they get side tracked trying to mix different things with the lessons.

(DPFF ¶ 69). Beamon's letter also used Supreme Mathematics and the Supreme Alphabet at various points. For example, he wrote "1+2+3=6 which equals (equality), meaning knowledge your knowledge you will deal with everything in your cipher" and "1=2=3=6=Equality=means equals in all reflection of life." (DPFF ¶ 71). Following the interception of the letter, Beamon's cell was searched and found to contain a folder with multiple pages of handwritten, typewritten, and computer print off materials all related to the NGE or groups with very similar ideology. (DPFF ¶ 72).

Wilke completed Adult conduct report number 2329927 on June 18, 2013 as a result of this incident. The conduct report charged Beamon with violating Wis. Admin. Code §§ DOC 303.20, Group Resistance and Petitions, 303.31 False Names and Titles, 303.24 Unauthorized Forms of

Communication, and 303.24, Disobeying Orders. (DPFF ¶ 74). On June 18, 2013, Wilke also completed a Review of Conduct Report/Evidence Related to Security Threat Groups, form DOC-2366. Wilke noted that Beamon was found to be in possession of and sending 5% NGE literature. The DOC recognizes the 5% NGE as an STG. (DPFF ¶ 75).

On June 19, 2013, Reigh reviewed Beamon's Conduct Report #2329927 pursuant to Wis. Admin. Code § DOC 303.67 (2006). He approved the conduct report for further processing. (DPFF ¶ 77). On June 24, 2013, Beamon was provided a Notice of Major Disciplinary Hearing Rights and Waiver of Major Hearing and Waiver of Time (for Major or Minor Disciplinary Hearings) form for conduct report #2329927. (DPFF ¶ 78). On June 20, 2013, Heft was appointed as Beamon's staff advocate for Conduct Report #2329927. (DPFF ¶ 79).

On June 24, 2013, Heft submitted Beamon's Request for Attendance of Witness. Beamon requested that Chaplain Barwis attend the disciplinary hearing. That same day, Capt. Reigh reviewed the request and approved the request for the witness to attend the hearing. (DPFF ¶ 80). On June 24, 2013, Heft sent a Memo to the Adjustment Committee. Heft noted that he had contacted Beamon regarding the disciplinary hearing. Heft also noted that Beamon was provided the opportunity to ask questions, provide comments, and request assistance. Heft responded to his questions and requests for assistance. Beamon was informed that, if he had any further questions or requests, he could contact this office. Lastly, Heft noted that he had checked for procedural errors and none were found. (DPFF ¶ 81).

On July 11, 2013, Tetzlaff held the disciplinary hearing for Beamon's Conduct Report #2329927. Heft was present for the disciplinary hearing and

had nothing to add to Beamon's testimony. No known conflicts of interest were noted to exist. (DPFF ¶ 82). At the hearing, Tetzlaff verified that Beamon received a copy of his due process rights. Tetzlaff read the conduct report out loud to the inmate and witness. The witness was escorted out of the hearing room. Beamon plead not guilty. Beamon submitted a written statement which Tetzlaff read and included in the conduct report record. In addition to the written statement, Beamon said at the hearing that he studied all religions to better himself, not spread to anybody else. Beamon said that, "The thing that says the white race is a genetic mutation, I didn't say that. That's what I spend my time doing, studying everything. I'm trying to direct my kids the correct way." (DPFF ¶ 83).

The physical evidence that Tetzlaff reviewed for the hearing included a copy of the letter, a folder, and papers. The folder contained a large amount of handwritten, typewritten, and computer print off materials, all related to the NGE or groups with very similar ideology. These items were examined in front of Beamon at the disciplinary hearing. (DPFF ¶ 85). Tetzlaff found Beamon guilty of 303.20(3), finding it more likely than not that Beamon was in possession of materials related to an STG. Tetzlaff also found Beamon guilty of 303.31 for using a name different than his own. Tetzlaff found Beamon not guilty of 303.30 because the charge was duplicative and not guilty of 303.24 because the charge was not supported. (DPFF ¶ 86). As a result of the guilty charges, Tetzlaff imposed a 90-day disciplinary separation penalty and ordered that all contraband from the conduct report be destroyed. Beamon did not ask for copies of physical evidence nor did he complain that he was not able to confront evidence. (DPFF ¶ 88).

On July 11, 2013, Beamon appealed the decision to the warden, Dittmann. In his appeal, Beamon did not make any claims of procedural

error in his disciplinary hearing. (DPFF ¶ 89). Dittmann affirmed the hearing officer's decision and the sentence on Adult Conduct Report #2329927. (DPFF ¶ 90). In a June 18, 2013 letter to Congress Woman Gwen Moore complaining about conduct report #2329927, Beamon stated "I study Moorish Science, Christianity, Nation of Islam, Nation of Gods and Earths, and Jewish Religion." (DPFF ¶ 91).

### 1.7    Beamon's Conduct Report #2328188

On June 17, 2013, the Security Director approved placing Beamon on mail monitoring status due to his activity that resulted in conduct report #2329927. (DPFF ¶ 92). On or about July 9, 2013, Wilke opened a letter Beamon had written to a family member. Upon opening the letter, Wilke saw that Beamon had enclosed stamps with his letter for mailing, in violation of DAI Policy 309.04.01 (IV)(F)8. (DPFF ¶ 93). Wilke gave Beamon's letter and the stamps to Officer Fischer to return to Beamon. Wilke directed Officer Fischer to inform Beamon that, per DAI policy, 309.04.01 (IV)(F)8, inmates are not allowed to send stamps through the mail, and that he could receive a conduct report for doing so in the future. Wilke did not give Beamon a conduct report for this incident because, to Wilke's knowledge, it was the first time he had been caught sending stamps through the mail. As a result, Wilke believed that a warning was the best way to handle the situation. (DPFF ¶ 94). Wilke believes he read the letter Beamon tried to send with stamps before having it returned to Beamon with the stamps. To Wilke's knowledge, the letter did not contain NGE related material. If Wilke had noticed NGE related material in the letter, he would have issued him a conduct report.  (DPFF ¶ 95).

On July 10, 2013, Wilke reviewed a letter written by Beamon to a family member in Mississippi, who he believed was Beamon's daughter. The

letter contained the following word graph: Hala – The Black, Orang Asli – Original People, Nakhi – Blackman, Hei Miao – Blackman, Litzu – Blackson, sag gig ga – Blackheads. These terms are commonly used by black supremacy groups, including NGE. (DPFF ¶ 96). Beamon also wrote "Tell my mother "Earth" to make sure daddy get on it and I'm cool tell her a thinking man remains unswayed at all times." By referring to his mother as an "Earth," Wilke believed that Beamon was openly displaying his allegiance to the 5% NGE, along with attempting to spread the 5% NGE ideology. (DPFF ¶ 97). The letter further stated "Tell him [your father] the dumb capt here misinterpertated everything from his own unintelligent understanding," "I was trying to send you some more stamps but these dumb people all of a sudden say I can't," "Tell your papa these got to be the dumbest people I ever came across they ain't even that dumb back home, everybody but these idiots know I haven't dealt with a dumb ass gang since Keanya been in the world 18 years." "At least Baby-girl if they racist there they let you know up front but you know who cares." On this portion of the letter there is a drawing of a face with a tongue sticking out. (DPFF ¶ 98). Beamon signed the letter Junior B, AKA "The Prophet," which was the same unauthorized NGE name Beamon used in his letter that resulted in conduct report #2329927. (DPFF ¶ 99).

That same day, Beamon was issued a Notice of Non-Delivery of Mail/Publication for a letter that contained 5% NGE literature and ideology along with disrespectful comments about RGCI staff. The reason for the non-delivery of the mail item was that the item posed a threat to the security, orderly operation, discipline or safety to the institution. (DPFF ¶ 100). Wilke completed Conduct Report number 2328188 on July 10, 2013, as a result of this incident. The conduct report charged Beamon with violating Wis.

Admin. Code §§ DOC 303.20, Group Resistance and Petitions, 303.31 False Names and Titles, 303.25, Disrespect, and 303.24, Disobeying Orders. (DPFF ¶ 101).Wilke also completed a Review of Conduct Report/Evidence Related to Security Threat Groups, form DOC 2366. Wilke noted that the DOC recognizes the 5% NGE as a Security Threat Group. Beamon was found to be in possession of or spreading literature or ideology of the 5% Nations of Gods and Earths in violation of Wis. Admin. Code § DOC 303.20. Wilke also advised that the letter written by Beamon contained clear messages and ideology of the 5% Nations of Gods and Earths. He noted that he had reviewed Conduct Report #2328188 and, based on his training and experience as the institution's Security Threat Groups Coordinator, Wilke concluded that the alleged violation of the Wis. Admin. Code § DOC 303.20 Group Resistance and Petitions is supported by the evidence and/or his testimony. (DPFF ¶ 102).

On July 11, 2013, Reigh reviewed Beamon's Conduct Report #2328188 as the security director's designee pursuant to Wis. Admin. Code § DOC 303.67. He approved the conduct report for further processing. (DPFF ¶ 103). On July 12, 2013, Beamon was provided a Notice of Major Disciplinary Hearing Rights and Waiver of Major Hearing and Waiter of Time (for Major or Minor Disciplinary Hearings) form. ( (DPFF ¶ 104). On July 12, 2013, Heft was appointed as Beamon's staff advocate for Conduct Report #2328188 and Beamon received a copy of the report. (DPFF ¶ 105).

On July 16, 2013, Reigh reviewed Beamon's request for the attendance of witnesses. The only witness Beamon requested to attend the hearing was Correctional Officer Fischer. Reigh noted that Officer Fischer was unable to attend the hearing due to a scheduling conflict. He approved Officer Fischer to give a statement in advance of the hearing in lieu of attending. (DPFF

¶ 106). On August 1, 2013, Heft sent a Memo to the Adjustment Committee. Heft noted that he had contacted Beamon regarding the disciplinary hearing. Heft also noted that Beamon was provided the opportunity to ask questions, provide comments, and request assistance. Heft responded to his questions and requests for assistance. Beamon was informed that, if he had any further questions or requests, he could contact this office. Heft noted that he had checked for procedural errors and none were found. (DPFF ¶ 107).

On August 1, 2013, Wesner held the disciplinary hearing for Beamon's Conduct Report #2328188 and Heft was present as the staff advocate. (DPFF ¶ 107). At the hearing, Wesner verified that Beamon received a copy of his due process rights. Wesner read the conduct report out loud to Beamon and the witness statement was put into evidence. Beamon pleaded not guilty. (DPFF ¶ 109).

Wesner found Beamon guilty of 303.20(3), and found it more likely than not that Beamon was attempting to spread information on the 5%ers and is actively practicing this literature. This is supported by the body of the report, physical evidence. Wesner found Beamon guilty of 303.25 for showing disrespect to staff. Wesner also found Beamon guilty of 303.31 for using a name different than his own. Wesner found Beamon not guilty of 303.24 because the charge was not supported. (DPFF ¶ 111). As a result of the guilty charges, Wesner imposed a 180 days in disciplinary separation and a referral to the Program Review Committee. (DPFF ¶ 114). Wesner believed that because Beamon committed a similar offense just weeks prior, a more severe penalty was appropriate to prevent him from continuing the behavior. (DPFF ¶ 114).

On August 1, 2013, Beamon appealed the disciplinary hearing officer's decision on Conduct Report #2328188 to the warden's office. The

appeal did not allege any procedural errors during the disciplinary hearing. Specifically, it did not allege that he was unable to view and confront physical evidence against him. Warden Dittmann affirmed Wesner's finding and sentence stating "conduct report and hearing results support findings of guild and disposition." (DPFF ¶ 115).

### 1.8 Allegations and Inmate Complaints

Beamon submitted fifteen offender complaints with the ICE relating to the issues that are the subject matter of this lawsuit. The fifteen offender complaints filed relating to the issues that are the subject matter of this lawsuit include: Offender Complaint RGCI-2013-11886, RGCI-2013-13537, RGCI-2013- 13559, RGCI-2013-13626, RGCI-2013-13624, RGCI-2013-14491, RGCI-2013-15586, RGCI-2013-15592, RGCI-2013-16511, RGCI-2013-16795, RGCI-2013-16897, RGCI- 2013-17112, RGCI-2013-17117, RGCI-2013-17828, and RGCI-2013-18160, which were accepted by the ICE office and processed. (DPFF ¶ 130).

Beamon maintains that he is not part of the NGE and that the defendants have misunderstood his use of religious language. (*See, e.g.,* Docket #26-1 at 33-36). He believes the defendants' security concerns related to NGE are exaggerated because he does not hold racist beliefs. (Docket #26-1 at 39). Beamon generally alleges that defendants Wilke, Dittman, Wesner, Reyes, Tetzlaff, Smith, and Heft retaliated against him for practicing his faith and that defendant Wilke further retaliated against him for filing an inmate complaint. (*See* Docket #26-1 at 37, 42).

### 2. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

3.      DISCUSSION

The defendants' motion for summary judgment argues they are entitled to judgment as a matter of law on Beamon's: (1) free exercise claim; (2) retaliation claims; (3) procedural due process claims; and (4) in the alternative, they are entitled to qualified immunity.[6] As discussed below, the

---

[6] The Court notes that Beamon was not allowed to proceed on a separate First Amendment claim regarding Wilke's opening up his mail. (Docket #11 at 5-6).

Court finds that the defendants are entitled to summary judgment on all claims as a matter of law.

### 3.1 First Amendment—Free Exercise

The Court allowed Beamon to proceed on a First Amendment free exercise claim against defendants Wilke, Dittmann, Wesner, Reyes, Tetzlaff, Smith, and Heft. (Docket #11 at 5). Beamon generally alleges that he is being "harassed and targeted for my rights to practice and study religion." (Docket #1 at 6). Although all the specifics of the alleged harassment are not entirely clear, Beamon's complaints appear to revolve around the fact that his religion is burdened by not being able to use his "religious name" and "religious jargon" to express himself. (*See* Docket #25 at 4).

The First Amendment's free exercise clause protects an inmate's right to exercise his religious beliefs in prison. *Tarpley v. Allen Cnty., Indiana* 312 F.3d 895, 898 (7th Cir. 2002). However, lawful incarceration "brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). Thus, a prison regulation that impinges on an inmate's constitutional rights will be considered valid "if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). "In the context of the Free Exercise Clause, the plaintiff must first establish that his right to practice his religion was burdened in a significant way." *Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005) (citing *Hernandez v. Comm'n of Internal Revenue*, 490 U.S. 680, 699 (1989)). The Seventh Circuit has held that a substantial burden is "one that necessarily bears a direct, primary, and fundamental responsibility for rendering religious exercise…effectively impracticable." *Civil Liberties for Urban Believers v. City of Chi.*, 342 F.3d 752, 761 (7th Cir. 2003).

Beamon identifies as a black Muslim and specifically not as part of NGE. (Docket #26-2 at 33). He "takes his religious knowledge from other religions," such as "Nations of Islam, Judaism, Christian Science, and finally Islamic Science." (Docket #1 at 5). Beamon adamantly asserts that his inability to use his religious name and "religious jargon" has substantially burdened his ability to practice his religion. Aside from his sworn statements, however, Beamon provides no evidence to support this argument.

The Supreme Court has held that a personal religious faith is entitled to as much protection as one espoused by an organized group. *Frazee v. Illinois Depart. of Emp't Security*, 489 U.S. 829, 834 (1989); *see also Hernandez v. CIR*, 490 U.S. 680, 699 (1989). Hierarchical religions, such as the Roman Catholic Church, believe that only the group's leaders can establish and articulate the group's tenets on central issues of faith. But non-hierarchical religions, such as most Protestant and Islamic sects, believe that every worshiper has a direct connection to God. *See Vinning-El v. Evans*, 657 F.3d 591, 593 (7th Cir. 2011). In determining whether a practice burdens religion, the Seventh Circuit has found that a prisoner's "unreasoned say-so" is insufficient to prove a substantial burden on their religious exercise. *Borzych v. Frank,* 439 F.3d 388, 390 (7th Cir. 2006).

Given these two principals, the Court is put in somewhat of a difficult position; on the one hand it must give Beamon's personal religious beliefs the same protection as an organized group, but, on the other hand, Beamon's "unreasoned say-so" is insufficient to overcome summary judgment. As articulated by the Second Circuit:

Case 2:14-cv-00136-JPS   Filed 09/14/16   Page 26 of 40   Document 75

> It cannot be gainsaid that the judiciary is singularly
> ill-equipped to sit in judgment on the verity of an adherent's
> religious beliefs. Mindful of this profound limitation, our
> competence properly extends to determining "whether the
> beliefs professed by a [claimant] are sincerely held and
> whether they are, in his own scheme of things, religious."

*Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984) (quoting *United States v. Seeger*, 380 U.S. 163, 185, (1965)). At the summary judgment stage, and in looking at all facts in the light most favorable to the non-moving party, the Court finds it prudent to assume for argument's sake that Beamon's beliefs are sincerely held. Nonetheless, Beamon's free exercise claim will still fail because the defendants' actions were reasonably relate to a legitimate penological interest.

A prison regulation that impinges on a prisoner's constitutional rights is valid only if it is "reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 85. The four factors relevant to the reasonableness determination are: (1) a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) "the absence of ready alternatives." *Id.* at 89–90 (internal quotation marks and citations omitted). In *Turner*, the Supreme Court expressly rejected any degree of "heightened scrutiny" in order to assure that "prison administrators…and not the courts …make the difficult judgments concerning institutional operations." *Id.* at 89.

Under *Turner,* prison officials do not have to rely on past problems to justify a rule. Rather, they are entitled to "anticipate security problems"

before they occur. *Id.* at 89. For example, in *Singer v. Raemisch*, 593 F.3d 529 (7th Cir. 2010), the Seventh Circuit considered a ban on role playing games and related publications. Prison officials justified the ban in part because role playing games "can mimic the organization of gangs and lead to [their] actual development." *Id.* at 535. While the defendants failed to point to a single example in which a role playing game had let to a security problem, the court rejected the plaintiff's argument that such evidence was required. *Id.* at 536. It was enough in *Singer* that the defendants had provided "a plausible explanation" for the ban. *Id.*

The Court finds that the defendants' prohibition of NGE materials satisfies the *Turner* test. As to the first prong, the defendants have put forth substantial evidence that NGE was designated as an STG because it holds racial supremacist views and has been linked to violence and gang-related activity in other prison systems. (DPFF ¶¶ 42-46). In addressing this issue, the Third, Fourth, and Sixth Circuits have all found similar bans to be rationally related to a legitimate penological interest. *See Fraise v. Terhune*, 283 F.3d 506, 516–21 (3d Cir. 2002) (applying the Turner test to conclude that the designation of this group as a security threat was reasonable); *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 469–71 (4th Cir. 1999) (same); *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *2 (6th Cir. May 5, 2010) (same). Not being experts in prison administration, but aware of the security problems in American prisons, judges sensibly defer within broad limits to the judgments of prison administrators. *Florence v. Board of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1515-16 (2012); *Beard v. Banks*, 548 U.S. 521, 528 (2006); *Overton v. Bazzetta*, 539 U.S. 126, 131-32 (2003) (plurality opinion); *Van den Bosch v.*

*Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011).[7]  As such, the Court finds the defendants' prohibition of NGE material is rationally related to a legitimate security interest.[8]

Second, Beamon had various alternative means of exercising his religion. Although he is prohibited from possessing religious material related to NGE, defendants point to several general activities offered for inmates to exercise their religion, including:  (1) congregate URG services and study groups; (2) request for religious diet accommodation; (3) individual study; (4) personal meditation, prayer, and/or other spiritual practices; (5) utilization of religious books and/or property; (6) observance of religious holidays in a URG service, study, or congregate meal; (7) individual religious observances/rituals in their living quarters; (8) correspondence with fellow believers; (9) pastoral visits; and (10) requesting to abstain from work or program on religious days of observance. (DPFF ¶ 16).  Thus, the Court finds that at least some alternatives exist and that the second *Turner* factor weighs in the defendants' favor.

---

[7]The Court notes that were it to examine the defendants' justifications for NGE bans under a more rigorous standard than *Turner*, the outcome here may likely have been different. The Court has doubts whether the defendants' few cited incidents of NGE violence that occurred over twenty years ago in other parts of the country should justify a blanket ban on NGE materials in Wisconsin prisons. However, the Court is constrained to give deference to the opinions of prison administrators as to how best operate their facilities.

[8]Beamon argues that he should be allowed to engage in NGE activity because "all the language I've used came from books I've ordered that the prison approved and delivered to me during mail distribution within the prison." (Docket #25 at 7). He cites to *Rios v. Lane*, 812 F.2d 1032, 1038 (7th Cir. 1987), and argues that this factor "prevents the prison from punishing expression that they previously approved." (Docket #25 at 7). Beamon may have a point, however, he did not allege and was not allowed to proceed at the screening stage for a due process vagueness claim. (*See* Docket #11).

The third and fourth *Turner* factors ask whether accommodation of the asserted constitutional right would have a negative impact on guards, other inmates and the allocation of prison resources; and, whether obvious, easy alternatives exist as evidence that the regulation is not reasonable. *See Turner*, 482 U.S. at 90. "[W]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90. Here, the defendants maintain that allowing NGE materials would have a negative impact on the safety of other inmates and guards. Specifically, defendants maintain that allowing inmates to openly align themselves with racial supremacist groups would dramatically increase the chances of conflict and violence between inmates of different races. (DPFF ¶ 42). Additionally, because the majority of staff at RGCI is Caucasian, defendants maintain that allowing racist and inflammatory messages would increase the chance of disruption in the institution and acts of violence against staff (DPFF ¶ 43).

In sum, the Court finds that, based upon the undisputed material facts, and after applying the *Turner* factors, Beamon has failed to demonstrate that there is a genuine issue of material fact as to whether the policies at issue in this case are reasonably related to the legitimate penological interests of maintaining security and protecting staff and inmates. Accordingly, the defendants are entitled to summary judgment as a matter of law on Beamon's free exercise claim.

### 3.2    First Amendment—Retaliation

The Court allowed Beamon to proceed on a retaliation claim against Wilke, Dittmann, Wesner, Reyes, Tetzlaff, Smith, and Heft. Specially, Beamon alleges that they harassed and intimidated him and spread the word that he

was a Nation of Islam Five Percenter, in retaliation for practicing his faith. Beamon also alleges that Wilke retaliated against him by writing a conduct report after Beamon filed an inmate complaint regarding the opened letter. The Court will begin its discussion with a general overview of First Amendment law regarding retaliation, and will then address each retaliation allegation separately.

Any "act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000) (citations omitted); *see also Pearson v. Welborn*, 471 F.3d 732, 738 (7th Cir. 2006) (holding same). Even conduct that otherwise does not violate the Constitution can form the basis for a retaliation claim if that conduct is done with an improper, retaliatory motive. *See DeWalt*, 224 F.3d at 618 (unconstitutional to transfer inmate for filing grievances); *Babcock*, 102 F.3d at 275 (unconstitutional to place inmate in administrative detention for filing grievances); *Higgason v. Farley*, 83 F.3d 807, 810 (7th Cir. 1996)

To establish a prima facie case of retaliation, an inmate must produce evidence that: (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter protected speech; and (3) his protected speech was a motivating factor in the defendants' actions. *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012) (clarifying allocation of evidentiary burdens at summary judgment in light of *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)); *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011) (same). If the inmate satisfies these elements, the burden shifts to the defendants to rebut the causal inference with evidence showing that they would have taken the same action even without any retaliatory motive. *See Kidwell*, 679 F.3d at 965; *Greene*, 660 F.3d at 979.

### 3.2.1 Retaliation for Religion

Beamon vaguely asserts that the defendants intimidated and harassed him "because of his religion." (Docket #1 at 5). He maintains that Wilke has a personal prejudice against Black Muslims and that Wilke has explicitly expressed these feelings. (Docket #25 at 3). Quite candidly, it is not entirely clear to the Court which specific acts of "practicing his faith" are the basis for Beamon's retaliation claims. However, it appears that Beamon alleges retaliation for using his religious language in the letters for which he received conduct reports. (*See* Docket #25 at 4 ("my letter is/was constitutionally protected activity of the 1st Amendment")).

The defendants maintain that Beamon's claim must fail at the outset because his activity is not protected by the First Amendment because the NGE regulations are related to a legitimate penological interest. (Docket #45 at 25). In doing so, the defendants appear to argue that because certain regulations are permissible under the *Turner* test, Beamon's expression of his religion is not First Amendment protected activity. The Court disagrees. Certainly, Beamon has a First Amendment right to be Muslim and practice his faith. *See Tarpley,* F.3d at 898.

Beamon's retaliation claims fail, however, to prove that his religious activity was the motivating cause for the defendants' actions. Beamon submits conclusory arguments that, because the defendants have a personal prejudice against Black Muslims, they seek to punish him. (*See* Docket #25 at 4). The Court recognizes that direct evidence of retaliation is difficult to obtain. However, at the summary judgment stage, a prisoner must submit evidence that his grievances were "a substantial or motivating factor in the prison official's conduct. *Brookins v. Kolb*, 990 F.2d 308, 315 (7th Cir. 1993). Conclusory and speculative allegations of retaliation are simply insufficient

to overcome summary judgment. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (speculation concerning retaliatory motives cannot create a genuine issue of material fact); *Borcky v. Maytag Corp.*, 248 F.3d 691, 695 (7th Cir. 2001).

In light of the foregoing, the Court finds that no reasonable juror could find a causal connection between Beamon's First Amendment activity and the deprivations he suffered. As such, the Court will grant the defendants' motion for summary judgment as to the general retaliation claims against defendants Wilke, Dittmann, Wesner, Reyes, Tetzlaff, Smith, and Heft.

### 3.2.2   Retaliation for Filing Inmate Complaint

Under the First Amendment, inmates have a constitutional right to file grievances and lawsuits without the threat of retaliation. *Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005); *Babcock v. White*, 102 F.3d 267, 274–75 (7th Cir. 1996). Here, Beamon has satisfied the first element. Defendants appropriately concede that Beamon has the right under the First Amendment to file his own truthful grievances and federal lawsuits. *See Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1005 (7th Cir. 2005).

As to the second prong, the Seventh Circuit noted in *Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982) that "[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise." *Id.* at 625. Here, the Court is satisfied that the alleged retaliatory actions—Wilke filing conduct reports that resulted in disciplinary segregation—is a deprivation that would likely deter protected speech. The Court notes, however, that Beamon continued to file grievances during this time period, fifteen grievances in a relatively short time.

Third, Beamon must show a causal connection between his First Amendment activity and the deprivations he suffered. Hence, the Court will analyze whether Beamon's constitutionally protected conduct was a motivating factor in Wilke's alleged retaliatory action. *See Greene*, 660 F.3d at 979. The Court again recognizes that direct evidence of retaliation is difficult to obtain. Defendants rarely admit that they want to retaliate against someone. It is, however, well established that a plaintiff cannot establish retaliation simply by showing that the protected activity happened before the defendants took their action, *see, e.g., Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003) (noting that one event's following closely upon another is not dispositive in proving that the first act caused the second); *see also Stone v. City of Indianapolis Public Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002) (''mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue'').

The defendants argue that Beamon's retaliation claim must fail because there is no evidence that Wilke had any knowledge of the complaints. Indeed, "protected conduct cannot be proven to motivate retaliation if there is no evidence that the defendants knew of the protected activity." *Morfin v. City of E. Chi.*, 349 F.3d 989, 1005 (7th Cir. 2003) (internal quotation marks and brackets omitted) (quoting *Stagman v. Ryan*, 176 F.3d 986, 1000–01 (7th Cir. 1999)); *accord Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668 (7th Cir. 2006). On July 10, 2013, Smith received the inmate complaint from Beamon. (DPFF ¶ 132). That same day, Wilke completed the conduct report based on Beamon's second letter showing NGE allegiance. (DPFF ¶ 101). Smith maintains that she never informed Wilke that the complaint had been filed. (DPFF ¶¶ 132, 135). Based on the same day filing,

defendants argue that it is not even clear whether the conduct report or the inmate complaint was filed first, and further argue that because Wilke did not know about the complaint, it could not have been a motivating factor in issuing the conduct report. (Docket #45 at 26).

In contrast, Beamon maintains that Wilke issued the conduct report in retaliation for filing his inmate complaint. In his affidavit, he submits that Wilke told Beamon he let him "slide the first time [he] tried to send [the letter] out but when I found out you wrote me up about not letting you send the stamps out and then when you tried to re-mail the letter again I figured I'd write you up since you wrote me up." (Docket #26-1 at 40). Beamon argues this statement establishes that Beamon's protected activity was the motivating factor in Wilke issuing him a conduct report.

Although somewhat of a close question, when taking all facts in the light most favorable to Beamon, the Court finds that he has met his burden to establish a prima facie claim for retaliation. The Court is skeptical whether the evidence shows that Wilke knew of the inmate complaint filed against him when he issued Beamon the conduct report; indeed, both were issued on the same day and it is not even clear which incident occurred first. However, if Beamon's allegations are true, and Wilke told Beamon he issued the conduct report because of the inmate complaint, a reasonable jury may find a prima facie case of retaliation. As such, the burden switches to the defendants to provide evidence showing that they would have taken the same action even without any retaliatory motive. *See Kidwell*, 679 F.3d at 965.

Beamon argues Wilke's actions show retaliation because Wilke did not write him a conduct report the first time he wrote the letter; Wilke only issued a report after knowledge of the complaint filed against him. (Docket #25 at 6). The Court, however, is unconvinced. The undisputed facts show

that Beamon's letter contained clear messages and ideology and that spreading literature or ideology of NGE is a violation of Wis. Admin. Code § DOC 303.20. (DPFF ¶ 102). The fact that Wilke did not issue a conduct report in the first instance is insufficient to suggest retaliation because there is no evidence that Beamon was aware of the NGE material at that time. Additionally, Beamon was in restrictive housing at the time for previous violations related to NGE activity (DPFF ¶ 95), and it is, therefore, reasonable to infer that Wilke would discipline him for the additional violations.

In sum, the Court concludes that Beamon has failed to show that Wilke would not have taken the same action absent a retaliatory motive. Beamon may well feel he was treated unfairly, but the First Amendment does not provide a remedy for any and all unfair treatment. *See Shaw v. Metzen*, No. 13-CV-847-WMC, 2015 WL 5123677, at *9 (W.D. Wis. Sept. 1, 2015). As such, the Court will grant the defendants' motion for summary judgment as to the retaliation claim against defendant Wilke for filing an inmate complaint.

### 3.3 Fourteenth Amendment—Procedural Due Process

The Court allowed Beamon to proceed on a procedural due process claim against defendant John Doe or Jane Doe, who was sued as Deputy Warden, and Tetzlaff. (Docket #11). Defendants argue that Beamon's due process claim must fail because: (1) he failed to exhaust his administrative remedies on the claim; and (2) the claims fail on the merits because Beamon received all the process he was due. As discussed below, the Court finds that Beamon failed to exhaust his remedies as to his due process case and, as such, the Court will grant the defendants' motion for summary judgment on this claim.

The Prison Litigation Reform Act mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a). Courts have adopted a "strict compliance approach" to the exhaustion requirement. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006); *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require."). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 126 S. Ct. 2378, 2386 (2006).

In Wisconsin prisons, the Inmate Complaint Review System ("ICRS") is the administrative remedy available to inmates with complaints about prison conditions or the actions of prison officials. Wis. Admin. Code § DOC 310.01(2)(a). The Wisconsin Administrative Code specifically provides that before an inmate may commence a civil action, the inmate shall exhaust all administrative remedies that the DOC has promulgated by rule. Wis. Admin. Code § DOC 310.05. The ICRS is available for inmates to "raise significant issues regarding rules, living conditions, staff actions affecting institution environment, and civil rights complaints." Wis. Admin. Code § DOC 310.08(1). In order to use the ICRS, an inmate must file a complaint with the inmate complaint examiner at his or her institution within fourteen days after the occurrence giving rise to the complaint. Wis. Admin. Code §§ DOC 310.07(1) & 310.09(6). Additionally, inmates challenging procedural errors in conduct reports may challenge them in a direct appeal to the warden. Wis. Admin. Code § DOC 303.76(7).

The defendants maintain that Beamon never exhausted his due process claim because neither his appeal to the warden nor any of his inmate complaints ever raised the issue of not being able to confront evidence. (Docket #45 at 28). Beamon makes no attempt to argue that he did in fact exhaust his administrative remedies. (*See generally* Docket #25, #59). In his own words, Beamon does not even appear to be alleging a procedural due process violation, stating, "I raise 1st Amendment claims about: (1) Religion; (2) Retaliation; (3) Protected Speech." (Docket #59 at 2). Defendants readily acknowledge that Beamon filed fifteen offender complaints with the ICE relating to the issues that are the subject matter of this lawsuit (DPFF ¶ 130), however, none of these complaints raise the issue of procedural due process. As such, the Court is obliged to grant the defendants' motion for summary judgment as to the due process claims for the failure to exhaust administrative remedies.

4.    RECONSIDERATION

Finally, Beamon seeks the Court's reconsideration of Judge Randa's previous denial of his motion for summary judgment. (Docket #69). Beamon seeks reconsideration because he argues that he submitted "evidence to support a ruling that would grant him a trial, *at the least.* (Docket #69 at 1) (emphasis added). Beamon further argues that Judge Randa erred in failing to consider his admissible affidavit evidence.

Motions for reconsideration "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Keene Corp. v. Int'l Fidelity Ins. Co.*, 561 F. Supp. 656, 665 (N.D. Ill. 1982), *aff'd*, 736 F.2d 388 (7th Cir. 1984); *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996); *see also Rothwell Cotton Co. v. Rosenthal Co.*, 827 F.2d 246, 251 (7th Cir. 1987) (quoting language in *Keene*). A party moving

for reconsideration "must demonstrate that newly discovered facts exist that require consideration, that there has been an intervening change in the law, or that the court has overlooked and thus failed to consider an aspect of the law presented by the [moving party] which, if left unredressed, would result in a clear error or cause manifest injustice." *Metro. Entm't Co., Inc. v. Koplik*, 25 F. Supp. 2d 367, 368 (D. Conn. 1998) (citing *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

The Court will deny Beamon's motion for reconsideration. As to his first argument, Beamon misunderstands the significance of a denial for summary judgment. Judge Randa's order did not preclude a trial as Beamon suggests. On the contrary, the denial of Beamon's motion for summary judgment simply concluded that he had failed to submit evidence that established he was entitled to judgment as a matter of law. As to his second argument, Beamon's argument is without merit. As noted above, the Court has gone to great lengths to consider Beamon's submitted evidence in the form of lengthy affidavits. Beamon failed to respond to *any* of the defendants' 150 proposed findings of fact (*see* Docket #47), however, the Court has made its best effort to acknowledge disputed factual issues based on Beamon's evidence. As discussed above, the Court finds that, when considering all the evidence, the undisputed facts entitle the defendants to summary judgment on all claims. As such, the Court will deny Beamon's motion for reconsideration.

5.    CONCLUSION[9]

In sum, the Court will grant summary judgment for the defendants and finds that: (1) Beamon fails to prove a free exercise violation on the merits; (2) Beamon fails to prove both retaliation claims on the merits; and (3) Beamon's procedural due process claim fails because he failed to exhaust his administrative remedies as to that claim. Additionally, the Court will deny Beamon's motion for reconsideration because summary judgment is appropriate for the defendants. As such, no claims remain, and the Court will dismiss this action in its entirety.

Accordingly,

IT IS ORDERED that the defendants' motion for summary judgment (Docket #44) be and the same is hereby GRANTED, as more fully described in detail above, and that this action be and the same is hereby DISMISSED; and

IT IS ORDERED that Beamon's motion for reconsideration (Docket #69) be and the same is hereby DENIED.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 14th day of September, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

___

[9]The Court need not address the defendants' remaining arguments related to personal involvement and qualified immunity because it finds no constitutional violations as a matter of law. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997) (finding that when a court determines in a § 1983 case that no constitutional violation occurred, it is unnecessary to consider whether defendants are entitled to qualified immunity).

Case 2:14-cv-00136-JPS   Filed 09/14/16   Page 40 of 40   Document 75